Kevin G. Little, SBN 149818
Michelle L. Tostenrude, SBN 290121
**LAW OFFICE OF KEVIN G. LITTLE**
Post Office Box 8656
Fresno, California 93747
Telephone: (559) 342-5800
Facsimile: (559) 242-2400
E-Mail: kevin@kevinglittle.com

Attorneys for Plaintiff Ignacio Ruiz

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF CALIFORNIA – FRESNO DIVISION

| | |
|---|---|
| IGNACIO RUIZ, an individual,<br><br>    Plaintiff,<br><br>  v.<br><br>THE CITY OF FRESNO; CHIEF PACO BALDERRAMA; DEPUTY CHIEF MINDY CASTO; CAPT. JOE ALVAREZ; CAPT. TOM ROWE; LT. ANTHONY DEWALL; LT. SEAN BIGGS; SGT. JOSHUA KNAPP; UNKNOWN LAW ENFORCEMENT OFFICERS,<br><br>    Defendants. | Case No.:<br><br>**COMPLAINT FOR DAMAGES AND REINSTATEMENT**<br><br>42 U.S.C. § 1983 - Retaliation – Public Employee<br>Cal. Labor Code § 1102.5 – Retaliation<br>Cal. Gov't Code § 12900, *et seq*. – Retaliation<br><br>JURY TRIAL DEMAND |

TO THE HONORABLE COURT :

Plaintiff Ignacio Ruiz ("Ruiz"), through his undersigned counsel, hereby states and alleges as follows based on his personal knowledge and on information and belief:

## INTRODUCTORY STATEMENT

For more than 25 years, Ruiz was a member in good standing of the Fresno Police Department with an exemplary record.  In 2021 Ruiz was promoted to the rank of Lieutenant, and he was in that role one of the highest ranking Hispanic officers in the Fresno Police Department.  However, despite his success, Ruiz was not blind to or silent about the dark side of



COMPLAINT FOR DAMAGES AND REINSTATEMENT           1

the Fresno Police Department, specifically the disfavor shown by the leadership of the Department against personnel who recognized that there was a pattern of prejudice against persons of color, both in the general public and within the department itself.  Ruiz was recognized as one of the Hispanic and Latinx officers who was a vocal critic of the Fresno Police Department's discriminatory practices, and he had become increasingly at odds with members of the Department who wanted to maintain the "business as usual" pattern of discrimination and disparate treatment of communities and officers of color.

At the end of 2022, Ruiz, who had a clean record in his quarter century with the Department, was the subject of a baseless internal affairs complaint of dishonesty and impropriety.  Ruiz immediately complained that this complaint was the product of the Fresno Police Department's longstanding pattern of discrimination, favoritism and reprisal.  This complaint remained pending for over a year, while a sweeping investigation was done, even though the complaint was both petty and unmeritorious.  Even further, more favored officers, ones who did not complain about the Department's pattern of favoritism and impropriety, who had been the subject of similar allegations that were sustained received minimal punishment.

Not so in Ruiz's case.  On Valentine's Day 2024, he was terminated from the Fresno Police Department after having been kept out on administrative leave for over a year.  Even during the pendency of his leave, Ruiz continued to complain about the improprieties within the Fresno Police Department, within the Department, to City of Fresno personnel, and to the California Attorney General.  In retaliation for his history of complaints and speaking out against discrimination and favoritism, Ruiz was terminated. Ruiz now is compelled to seek justice, both for himself and the other officers and members of the public who have been wronged by the same misconduct.

## **JURISDICTION AND VENUE**

1.  This Court has subject matter jurisdiction over this federal civil rights action pursuant to 28 U.S.C. §§ 1331 and 1343. This Court also has jurisdiction over the supplemental state claims alleged pursuant to 28 U.S.C. § 1367.  Venue in this judicial district is proper pursuant to 28 U.S.C. § 1391.



2.   Ruiz has fulfilled all prerequisites to filing suit, including by making timely complaints to the City of Fresno and the California Civil Rights Division, the denial or closure of which gave him to right to bring his state law claims asserted herein in this Court.

**PARTIES**

3.   At all material times, Ruiz was and is a citizen of the United States and an adult resident of County of Fresno. As stated above, Ruiz was a sworn peace officer employed by the Fresno Police Department for more than 25 years by the time he was terminated.

4.   Defendant City of Fresno ("COF") is and at all times was a municipal corporation chartered under the laws of the State of California.  COF is primarily responsible for supervising and funding the Fresno Police Department, the agency with primary jurisdiction within the City of Fresno.  COF is being sued herein because the retaliatory decision to terminate Ruiz was made by the chief decisionmaker of the Fresno Police Department and therefore qualifies as a policy, custom or practice for purposes of *Monell v. Department of Social Services*, 436 U.S. 658 (1978), and its progeny.  COF is also sued under state law, both because it is liable as Ruiz's employer under the state laws invoked herein and also because it is vicariously liable for the acts and omissions of its public employees consistent with California Government Code § 815.2.

5.    Defendant Chief Paco Balderrama ("Chief Balderrama") is and at all times was the Chief of the Fresno Police Department, and in that capacity had decision making authority personnel decisions, including the decision to terminate Ruiz.  Chief Balderrama is sued in his personal capacity for acts performed under color of law and in the course and scope of his employment with COF.

6.   Defendant Deputy Chief Mindy Casto ("Deputy Chief Casto") is and at all times was either employed as a Captain or as a Deputy Chief with the Fresno Police Department.  Deputy Chief Casto is sued in her personal capacity for acts performed under color of law and in the course and scope of her employment with COF.

7.   Defendant Captain Joe Alvarez ("Captain Alvarez") is and at all times was employed as a Lieutenant or Captain with the Fresno Police Department.  Captain Alvarez is sued in his

KGL

COMPLAINT FOR DAMAGES AND REINSTATEMENT                                                    3

personal capacity for acts performed under color of law and in the course and scope of his employment with COF.

8.  Defendant Captain Tom Rowe ("Captain Rowe") is and at all times was employed as a Lieutenant or Captain with the Fresno Police Department.  Captain Rowe is sued in his personal capacity for acts performed under color of law and in the course and scope of his employment with COF.

9.  Defendant Lieutenant Anthony DeWall ("Lieutenant DeWall") is and at all times was employed as a Lieutenant with the Fresno Police Department.  Lieutenant DeWall is sued in his personal capacity for acts performed under color of law and in the course and scope of his employment with COF.

10.  Defendant Lieutenant Sean Biggs ("Lieutenant Biggs") is and at all times was employed as a Lieutenant with the Fresno Police Department.  Lieutenant DeWall is sued in his personal capacity for acts performed under color of law and in the course and scope of his employment with COF.

11. Defendant Joshua Knapp ("Sergeant Knapp") is and at all times was employed as a Sergeant with the Fresno Police Department.  Sergeant Knapp is sued in his personal capacity for acts performed under color of law and in the course and scope of his employment with COF.

12. Ruiz is ignorant of the true names and capacities of defendants sued herein as Unknown Law Enforcement Officers and therefore sue said defendants by such fictitious names. Along with the named individual defendants, each of the fictitious defendants is legally responsible and liable for the injuries and damages alleged herein. Ruiz will amend this complaint to allege the true names and capacities of these defendants when they are ascertained. These fictitious defendants are all sued in their personal capacities for acts performed under color of law.

**<u>FIRST CLAIM</u>**

(42 U.S.C. §1983: Retaliation – Public Employee)

(Against All Defendants)

13. Ruiz realleges the foregoing paragraphs as if set forth herein.



14. Ruiz engaged in constitutionally protected activity when he spoke on matters of public concern, specifically a pattern of discrimination and favoritism both within the Fresno Police Department and with respect to the general public it is tasked with protecting and serving. Specifically, Ruiz was critical regarding (1) the Fresno Police Department's failure to comply with state law in maintaining the demographic data of the persons it detained, arrested and referred for prosecution; (2) the Department's provision of disparate and selectively enforced services in different parts of the COF, depending on the ethnic makeup of the subject areas; (3) the disparate use of injurious and deadly force in communities of color; (4) the disparate and discriminatory reference to officers who had some of all of the above-enumerated views as the "Mexican Mafia" and other pejorative terms; and (5) the Fresno Police Department's pattern of favoritism in how various personnel practices were effectuated, including regarding review, supervision, promotion, discipline, and termination of officers based on their racial and/or ethnic backgrounds, or their actual or perceived disapproval of the discriminatory practices outlined above. Speaking out on some or all of these issues was not required under Ruiz's job description, and he was acting at least in part as a private citizen in making the observations, complaints and/or criticisms he did on the above-enumerated topics.

15. Ruiz continued to complain about these issues after he became the subject of an insubstantial internal affairs complaint related to a minor traffic accident.  In fact, Ruiz disseminated the complaint attached hereto as Exhibit A within the Fresno Police Department, to the City of Fresno's administration, and also to the California Attorney General.

16. As a result of his constitutionally protected activity, Ruiz was subjected to adverse employment actions by the Defendants under color of state law that would chill a person of ordinary firmness from continuing to engage in that protected activity, when Defendants' combined efforts resulted in the lodging of a baseless internal affairs complaint against him, suspending and placing him on administrative leave for over a year, and ultimately terminating him.

17. The respective roles of the individual defendants with respect to this pattern of retaliation are as follows:

a. Chief Balderrama was an active participant in the internal affairs investigation and made the ultimate decisions to suspend and terminate Ruiz. Chief Balderrama was aware of the disparate and unfair nature of the recommended suspension and termination of Ruiz and acceded to it precisely because of Ruiz's history of protected complaints.

b. Deputy Chief Casto was also an active participant in the internal affairs investigation and provided a statement that was false or misleading regarding her communication with Ruiz in the immediate aftermath of the automobile accident, specifically regarding communication related to Ruiz's department issued cell phone.  Deputy Chief Casto's incorrect version of events was relied upon heavily in the decision to terminate Ruiz. Deputy Chief Casto also harassed Ruiz and subjected him to disparate treatment once he was promoted to Lieutenant and came under her supervision, including displaying rude, belittling and disrespectful behavior towards Ruiz.

c. Captain Alvarez was also an active participant in the internal affairs investigation, specifically regarding the investigation into Ruiz's department issued cell phone. Captain Alvarez also harassed Ruiz and subjected him to disparate treatment once Ruiz was promoted to Lieutenant and came under his supervision, including displaying rude, belittling and disrespectful behavior towards Ruiz.

d. Captain Rowe was also an active participant in the internal affairs investigation, specifically regarding the investigation into Ruiz's department issued cell phone. Captain Rowe also harassed Ruiz and subjected him to disparate treatment once Ruiz was promoted to Lieutenant and came under his supervision, including displaying rude, belittling and disrespectful behavior towards Ruiz.

e. Lieutenant DeWall initiated the internal affairs complaint against Ruiz, on specious grounds and based on his longstanding animosity against Ruiz based on the positions Ruiz took regarding the longstanding pattern of discrimination and favoritism by the Fresno Police Department.



    f.  Lieutenant Biggs was an active participant in the internal affairs complaint against Ruiz, specifically regarding the investigation into Ruiz's department issued cell phone. Lieutenant Biggs also harassed Ruiz and subjected him to disparate treatment once Ruiz was promoted to Lieutenant and worked closely with him, including displaying rude, belittling and disrespectful behavior towards Ruiz.

    g.  Sergeant Knapp was the chief investigator with respect to the internal affairs complaint made against Ruiz, and he engaged in selective practices and performed an investigation that was biased and selective, where the result was preordained. Sergeant Knapp's result-oriented investigation as both reflective of the Fresno Police Department's longstanding pattern of disparate personnel practices and also in retaliation for Ruiz's complaints about them, as well as the Department's discriminatory practices in general.

18. There was a substantial causal relationship between Ruiz's constitutionally protected activity and the adverse action taken against him by Defendants, because Defendants' actions directly and expressly punished Ruiz for his constitutionally protected activity.

19. Specifically, the individual defendants collectively participated in proceedings that resulted in the suspension and termination of Ruiz on specious grounds. Ruiz is informed and believes that the false and misleading allegations pertaining to his cell phone usage, which were a result of the collective efforts of the individual defendants, were the key justification for his suspension and termination. In this manner, the individual defendants not only acted individually but also developed and maintained policies and customs that violated Ruiz's constitutional rights. The Defendants collectively ratified, endorsed, and abetted these retaliatory decisions and actions, and the basis for them. The Defendants, individually and collectively, knew of, ratified, and failed to stop, the imposition of these adverse personnel decisions against Ruiz for exercising his First Amendment rights.

20. As a direct result of Ruiz's exercising his constitutional right to speak publicly—at least in part as a citizen—publicly on matters of public concern, the individual defendants, and each of them, retaliated against him, including, *inter alia*, collectively taking adverse employment

1  actions – suspension and termination -- against him. Absent Ruiz's exercising his

2  constitutionally protected rights to speak, the Defendants would not have taken the adverse

3  employment actions against him set forth herein.

4      21. At all times mentioned herein, Ruiz's constitutionally protected activities were related to

5  matters of public concern and were not undertaken pursuant to job duties. Indeed, Ruiz's speech

6  was on matters of widely-debated public concern, i.e., discrimination and misconduct by law

7  enforcement.

8      22. By taking adverse employment actions against Ruiz that were motivated by his

9  constitutionally protected speech, the Defendants violated his rights under the First Amendment

10  to the United State Constitution.  The actions taken against Ruiz by the Defendants have been

11  continuing in nature since at least 2022 and continuing to the date of Ruiz's termination on

12  February 14, 2024, with the intention of ending his law enforcement career, simply because he

13  spoke out on important issues of public concern.

14      23. As alleged above, Ruiz's retaliatory suspension and termination were approved and

15  ratified by Chief Balderrama, the policymaker of the Fresno Police Department. These decisions

16  and adverse personnel actions thus reflect official policy, custom and practice of the Fresno

17  Police Department consistent with *Pembaur v. City of Cincinnati*, 475 U.S. 469 (1986), and its

18  progeny.  These actions are therefore attributable to the COF and were the moving force behind

19  the above-alleged constitutional violations.

20      24. COF's official policy, custom, pattern and practice of retaliating against Ruiz for his

21  speech on matters of public concern has a continued chilling effect upon his speech activities.

22  The adverse employment actions were intended to, did, and would reasonably chill and deter

23  Ruiz or similarly situated public employees from speaking publicly on matters of public concern,

24  out of fear that they may be punished as public employees.

25      25. As a direct result of the Defendants' misconduct and unconstitutional actions, Ruiz has

26  suffered significant damages in an amount subject to proof at trial,including substantial financial

27  losses, and also psychological and emotional harms; reputational harms; lost promotional

28



opportunities and associated lost wages and pension income; and lost future income from post-retirement private-sector employment opportunities that will be unavailable to him.

26. As a direct, foreseeable, and proximate result of the Defendants' acts and omissions, Ruiz has suffered and continues to suffer mental and emotional distress, humiliation, anxiety, embarrassment, and discomfort, to his damage, in an amount according to proof at the time of trial, and expenses incurred for treatment of same.

27. In performing the acts herein alleged, the Defendants acted intentionally to injure Ruiz, namely, to adversely affect his employment, because of the content of his constitutionally protected speech on matters of public concern, which he engaged in as a citizen.

28. The individual Defendants' conduct was oppressive, despicable and performed with a willful, conscious, and reckless disregard of Ruiz's civil rights such that punitive or exemplary damages are warranted.

29. Ruiz additionally requests an award of his reasonable attorney fees and costs pursuant to 42 U.S.C. § 1988.

30. Ruiz also requests any additional relief in law or equity to which he would be required by the interests of justice, including the alternative equitable remedy of reinstatement to his position as Lieutenant in lieu of front pay. Reinstatement is an equitable remedy. *See Lutz v. Glendale Union High Sch.*, 403 F.3d 1061, 1069 (9th Cir. 2005). Equitable relief cannot be subject to dismissal based on qualified immunity. *See Hydrick v. Hunter*, 669 F.3d 937, 942 (9th Cir. 2012).

### SECOND CLAIM

(Cal. Labor Code § 1102.5 - Retaliation)

(Against the City of Fresno)

31. Ruiz realleges the foregoing paragraphs as if set forth herein.

32. Ruiz engaged in statutorily protected activity when he spoke out on and complained about actual or perceived illegalities, specifically a pattern of discrimination and favoritism both within the Fresno Police Department and with respect to the general public it is tasked with protecting and serving. Specifically, Ruiz was critical regarding (1) the Fresno Police



Department's failure to comply with state law in maintaining the demographic data of the persons it detained, arrested and referred for prosecution; (2) the Department's provision of disparate and selectively enforced services in different parts of the COF, depending on the ethnic makeup of the subject areas; (3) the disparate use of injurious and deadly force in communities of color; (4) the disparate and discriminatory reference to officers who had some of all of the above-enumerated views as the "Mexican Mafia" and other pejorative terms; and (5) the Fresno Police Department's pattern of favoritism in how various personnel practices were effectuated, including regarding review, supervision, promotion, discipline, and termination of officers based on their racial and/or ethnic backgrounds, or their actual or perceived disapproval of the discriminatory practices outlines above. Speaking out on some or all of these issues and making the observations, complaints and/or criticisms Ruiz did on the above-enumerated topics was activity that could not lawfully be the basis for an adverse employment action against him.

33. Ruiz continued to complain about these issues after he became the subject of an insubstantial internal affairs complaint related to a minor traffic accident.  In fact, Ruiz disseminated the complaint attached hereto as Exhibit A within the Fresno Police Department, to the City of Fresno's administration, and also to the California Attorney General.

34. As a result of his statutorily protected activity, Ruiz was subjected to retaliatory adverse action by the COF, when it, acting through its agents and employees, initially lodged a baseless internal affairs complaint against him, suspended him and placed him on administrative leave for over a year, and ultimately terminated him.

35. There was a substantial causal relationship between the statutorily protected activity and the adverse action taken against Ruiz by the COF, because it directly and expressly punished him for his protected activity.

36.  As a direct result of Ruiz's exercising his right to speak out and complain about these actual or perceived illegalities, the COF retaliated against him, including, *inter alia*, taking adverse employment actions – suspension and termination -- against him. Absent Ruiz's exercising his protected rights to speak out against actual or perceived illegalities, the COF would not have taken the adverse employment actions against him set forth herein.



37. By taking adverse employment actions against Ruiz that were motivated by his protected activity, the COF violated his rights against retaliation under Cal. Labor Code § 1102.5. The actions taken against Ruiz by the COF have been continuing in nature since at least 2022 and continuing to the date of Ruiz's termination on February 14, 2024, with the intention of ending his law enforcement career, simply because he spoke out on important issues of actual or perceived illegality.

38. As a direct result of the COF's acts and omissions, Ruiz has suffered significant damages in an amount subject to proof at trial, including substantial financial losses, and also psychological and emotional harms; reputational harms; lost promotional opportunities and associated lost wages and pension income; and lost future income from post-retirement private-sector employment opportunities that will be unavailable to him.

39. As a direct, foreseeable, and proximate result of the COF's retaliatory acts, Ruiz has suffered and continues to suffer mental and emotional distress, humiliation, anxiety, embarrassment, and discomfort, to his damage, in an amount according to proof at the time of trial, and expenses incurred for treatment of same.

40. In performing the acts herein alleged, the COF acted intentionally to injure Ruiz, namely, to adversely affect his employment, because of the content of his protected activity.

41. Ruiz requests an award of his reasonable attorney fees and costs pursuant to Cal. Labor Code § 1102.5, subdivision (j).

42. Ruiz also requests any additional relief in law or equity to which he would be required by the interests of justice, including the alternative equitable remedy of reinstatement to his position as Lieutenant in lieu of front pay.

### THIRD CLAIM

(Cal. Government Code § 12900, *et seq*. - Retaliation)

(Against the City of Fresno)

43. Ruiz realleges the foregoing paragraphs as if set forth herein.

44. Ruiz engaged in statutorily protected activity when he spoke out on and complained about actual or perceived discrimination and other conduct that could reasonably have been



1   believed to violate California's Fair Employment and Housing Act (FEHA), Cal. Government
2   Code § 12900, *et seq.* Specifically, Cal. Gov't Code § 12940, Chapter 6 of FEHA, prohibits
3   discrimination and retaliation in the workplace, and Ruiz spoke out against a pattern of
4   discrimination and favoritism both within the Fresno Police Department and with respect to the
5   general public it is tasked with protecting and serving. Specifically, Ruiz was critical regarding
6   (1) the Fresno Police Department's failure to comply with state law in maintaining the
7   demographic data of the persons it detained, arrested and referred for prosecution; (2) the
8   Department's provision of disparate and selectively enforced services in different parts of the
9   COF, depending on the ethnic makeup of the subject areas; (3) the disparate use of injurious and
10  deadly force in communities of color; (4) the disparate and discriminatory reference to officers
11  who had some of all of the above-enumerated views as the "Mexican Mafia" and other pejorative
12  terms; and (5) the Fresno Police Department's pattern of favoritism in how various personnel
13  practices were effectuated, including regarding review, supervision, promotion, discipline, and
14  termination of officers based on their racial and/or ethnic backgrounds, or their actual or
15  perceived disapproval of the discriminatory practices outlined above. Speaking out on some or
16  all of these issues and making the observations, complaints and/or criticisms Ruiz did on the
17  above-enumerated topics was activity that could not lawfully be the basis for an adverse
18  employment action against him.

19      45. Ruiz continued to complain about these issues after he became the subject of an
20  insubstantial internal affairs complaint related to a minor traffic accident. In fact, Ruiz
21  disseminated the complaint attached hereto as Exhibit A within the Fresno Police Department, to
22  the City of Fresno's administration, and also to the California Attorney General.

23      46. As a result of his FEHA protected activity, Ruiz was subjected to retaliatory adverse
24  action by the COF, when it, acting through its agents and employees, initially lodged a baseless
25  internal affairs complaint against him, suspended him and placed him on administrative leave for
26  over a year, and ultimately terminated him.

27

28

47. There was a substantial causal relationship between the statutorily protected activity and the adverse action taken against Ruiz by the COF, because it directly and expressly punished him for his protected activity.

48. As a direct result of Ruiz's exercising his right to speak out and complain about these actual or perceived illegalities, the COF retaliated against him, including, *inter alia*, taking adverse employment actions – suspension and termination -- against him. Absent Ruiz's exercising his protected rights to speak out against actual or perceived illegalities, the COF would not have taken the adverse employment actions against him set forth herein.

49. By taking adverse employment actions against Ruiz that were motivated by his protected activity, the COF violated his rights against retaliation under FEHA. The retaliatory actions taken against Ruiz by the COF have been continuing in nature since at least 2022 and continuing to the date of Ruiz's termination on February 14, 2024, with the intention of ending his law enforcement career, simply because he spoke out on important issues of actual or perceived illegalities under FEHA.

50. As a direct result of the COF's acts and omissions, Ruiz has suffered significant damages in an amount subject to proof at trial,including substantial financial losses, and also psychological and emotional harms; reputational harms; lost promotional opportunities and associated lost wages and pension income; and lost future income from post-retirement private-sector employment opportunities that will be unavailable to him.

51. As a direct, foreseeable, and proximate result of the COF's acts and omissions, Ruiz has suffered and continues to suffer mental and emotional distress, humiliation, anxiety, embarrassment, and discomfort, to his damage, in an amount according to proof at the time of trial, and expenses incurred for treatment of same.

52. In performing the acts herein alleged, the COF acted intentionally to injure Ruiz, namely, to adversely affect his employment, because of his FEHA protected activity.

53. Ruiz requests an award of his reasonable attorney fees and costs pursuant to Cal. Gov't Code § 12965, subdivision (b).

54. Ruiz also requests any additional relief in law or equity to which he would be required by the interests of justice, including the alternative equitable remedy of reinstatement to his position as Lieutenant in lieu of front pay.

## JURY DEMAND

Plaintiff hereby demands a trial by jury of all issues so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure and the Seventh Amendment.

Dated: March 7, 2024                    LAW OFFICE OF KEVIN G. LITTLE

                                        */s/ Kevin G. Little*
                                        Kevin G. Little
                                        Attorneys for Plaintiff Ignacio Ruiz

KGL

# EXHIBIT A

# RACIAL DISCRIMINATION - CITY OF FRESNO

## LIST OF WITNESSES TO BE INTERVIEWED:

1. Chief of Police Paco Balderrama

2. Deputy Chief Mark Salazar

3. Captain David Ramos

4. Lieutenant Steve Viveros

5. Lieutenant Israel Reyes

6. Lieutenant Andre Benson

7. Sergeant Leonard Cabrera

8. Sergeant Christine Leyva

9. Sergeant Ramon Ruiz

10. Officer Dominic Morini

## CASE SUMMARY

The City of Fresno and the Fresno Police Department have engaged in a pattern and practice of systemic racial discrimination against minority officers, including myself, for many years as the result of the leadership of then-Police Chief Jerry Dyer, who served as Chief for 18 years, and today continues to oversee the operations of the police department as mayor of the City of Fresno. Consequently, employment practices that discriminate against minority officers, specifically concerning assignments, promotions, internal affairs investigations, and discipline have occurred and are continuing to occur. The pattern of racial discrimination within the police department is evidenced by the many racial discrimination lawsuits brought against Dyer and the City of Fresno during Dyer's tenure as police chief, resulting in costly litigation, settlements, and payouts paid by Fresno taxpayers. Dyer was also twice accused of having a sexual relationship with an underage girl while he was a Fresno police officer. The accusations occurred before Dyer became police chief and then again before becoming mayor, questioning the entire process for holding such authority positions for the city. Dyer has never publicly denied the allegation. Consequently, Dyer's abuse of power allows him to promote a toxic and divisive culture within the police department that has eroded its community's trust, deteriorated the police department's ability to provide effective public safety, failed to provide equal employment opportunities, and has led to corruption within the police department.

Mayor Dyer receives special treatment and/or favoritism from the Fresno Police Department. Recently, Internal Affairs Bureau Captain Joey Alvarez downplayed a serious officer misconduct investigation involving Dyer's nephew-in-law, Officer Jason Serrano. Captain Alvarez covered up this misconduct and withheld this information from Chief Paco Balderrama. Former Internal Affairs Commander Steve Viveros is a witness to the downplaying of this serious misconduct by Captain Alvarez and made Chief Balderrama aware. Chief Balderrama ignored Lieutenant Viveros' allegations, failed to investigate Captain Alvarez, and did not remove Captain Alvarez from his position. Rather, Lieutenant Viveros was removed from the Internal Affairs Bureau and reassigned. Chief Balderrama also failed to properly discipline Officer Serrano, who was never placed on administrative leave, never had his department-issued badge and firearm removed, and was kept in his same assignment, where he remains today. Officer Serrano is currently under prosecution by the Santa Cruz Superior Court for battery/assault charges on a security officer that was captured on video. Mayor Dyer's niece and wife to Serrano, Dawnielle, was present during the assault. While at a Christmas dinner I attended with Chief Balderrama in December 2022, Chief Balderrama mentioned to me Alvarez withholding information from him and Alvarez accused Chief Balderrama of yelling at him.

The systemic racial discrimination culture that is condoned by the City of Fresno has also affected the police department's ability to effectively provide public safety to all residents of Fresno without fear of racial profiling. Although California Assembly Bill 953 mandates for the Fresno Police Department to collect and report demographic data for all vehicle and pedestrian stops and citizen complaints alleging racial and identity profiling, the Fresno Police Department has failed to do so and is incapable of policing itself and effectively holding officers accountable. An audit of these reports and/or records will show a disproportionate amount of stops/detentions involving minorities in Fresno in comparison to its white community. The oversight demonstrated by the city of Fresno and its police department has also jeopardized the safety of all residents, which has led to unequal treatment of communities of color, especially as it relates to officer-involved shootings. Wrongful death lawsuits and/or settlements over the course of many years have resulted in millions of dollars paid out by the city.

The City of Fresno is mandated by law to serve its community with integrity, transparency, and accountability but it does not. Conversely, Dyer's status as mayor has allowed him to project an image he is "above the law" and cannot be held accountable, which is evident in the slew of lawsuits made against him over the years, accusing him of illegal, immoral, and unethical acts. Moreover, Dyer has surrounded himself with highly influential and powerful figures in Fresno who have and will defend him if/when he is ever accused of wrongdoing as an effort to conceal any notion of impropriety within the City of Fresno and its police department. The city attorney's office, specifically Chief Assistant City Attorney Francine Kanne is close friends with Deputy Chief Mindy Casto, who is a close friend to Internal Affairs Captain Joey Alvarez and Traffic Bureau Lieutenant Anthony Dewall, which compromises the ability for a fair and impartial investigation to occur when it involves any hostile work environment complaint and/or lawsuit against the City of Fresno, especially when it involves Dyer.

Minority officers, such as myself, fear retaliation, mistreatment, and pushback for reporting such corruption and/or racial disparities in their respective assignments. Some voiced their opinions to their superiors, were ignored, and were subject to retaliation as a result, where white officers were protected instead. Although these said officers still fear retaliation, they have come forward

and are witnesses to this complaint. I also fear retaliation and know I will be ostracized by the City of Fresno and the Fresno Police Department after having come forward and breaking the "Code of Silence." Minority officers also continue to be underrepresented in command staff positions within the Fresno Police Department. Further, minority officers are excluded, unsupported, overlooked, and consistently passed over for promotion and/or career advancement opportunities. Civil rights laws prohibit California employers from discriminating against employees based on race and/or national origin.

As a 24-year veteran officer at the current rank of Police Lieutenant, I have also experienced disparate treatment due to my race/national origin. Recently, I was targeted as the subject of an unfair, grossly biased, and extremely tainted investigation by the Fresno Police Department's Traffic and Internal Affairs Bureaus since December 2022 regarding minor damage to my assigned work vehicle that I reported to an on-duty sergeant as soon as I became aware of the damage. This tainted investigation led to a multitude of false accusations/allegations toward me, causing me anxiety, anguish, and mental suffering. As a result of this tainted investigation that was leaked by the Traffic and the Internal Affairs Bureaus, many high-ranking officers, who are also Latino/Hispanic, have since shared with me their personal experiences of disparate treatment at the Fresno Police Department due to their race/national origin.

## INTERNAL AFFAIRS BUREAU CORRUPTION BY CAPTAIN JOEY ALVAREZ

Note: Alvarez is currently an "Accused" regarding an unrelated internal affairs investigation, and Biggs is off work due to a medical condition.

Internal Affairs Captain Joey Alvarez showed special treatment and/or favoritism to Mayor Dyer when he covered up and downplayed misconduct by Officer Jason Serrano, nephew-in-law to Dyer, who was arrested in Santa Cruz in 2021 for assaulting a security officer at the Santa Cruz Beach Boardwalk. Captain Alvarez intentionally withheld the information regarding Serrano's arrest from Chief Balderrama, who later found out from Lieutenant Viveros. Chief Balderrama did not, however, have Alvarez investigated for this serious misconduct of immoral and unethical behavior, all of which are violations of Fresno Police Department policy. Moreover, Balderrama did not place Officer Serrano out on administrative leave, they allowed him to retain his badge and department-issued firearm, was never removed from his assignment, and remains today assigned as a range instructor at the Fresno Police Department's Regional Training Center, although charges are pending against him in the Santa Cruz Superior Court. Serrano's wife, Dawnielle (maiden last name Dyer) was present during the assault which was captured on video. Viveros is a witness to this entire coverup by Alvarez and has further testimony regarding other incidents of corruption by Alvarez while working under Alvarez as the former Internal Affairs Commander.

Lieutenant Viveros, who was the Internal Affairs commander at the time, witnessed these immoral and unethical acts by his superior, Captain Alvarez. When Viveros told Chief Balderrama what occurred, Chief Balderrama ignored Viveros, failed to investigate the misconduct by Alvarez, and failed to remove Alvarez from his assignment. Viveros endured retaliation for coming forward instead and was eventually ousted from the bureau and reassigned. Viveros also made Chief Balderrama aware of other policy violations by Captain Alvarez but

Chief Balderrama never investigated them either. Viveros previously served as the former president of the now-defunct Hispanic Peace Officers' Association (HPOA).

The Internal Affairs Bureau, led by Captain Joey Alvarez, consistently allows for confidential information to be leaked regarding investigations by sharing this information with his group of associates that includes the Traffic Bureau to select/manipulate/control which cases involving officer misconduct will be targeted and extensively investigated to the point of extreme lengths. Captain Alvarez has intentionally and maliciously withheld and covered up misconduct investigations to protect his close friends/associates, such as the previously discussed 2021 arrest of Officer Jason Serrano for battery/assault charges in Santa Cruz. Captain Alvarez has abused his authority for such incidents as described above within the Internal Affairs Bureau to dominate, limit, and control the advancement of minority officers, especially those who aspire to promote and/or are currently in command staff positions. His behavior can be best described as a "puppeteer" who has strategically crafted an Internal Affairs Bureau of his likeness by handpicking incompetent investigators (Josh Knapp and Justin Bell) and an incompetent commander (Sean Biggs)—all of which are close associates of his—whom he could manipulate/control to best fit his underlying motive with ill intentions. This is evident through the forthcoming testimonies of former IA Commander Steve Viveros, Lieutenant Israel Reyes, and Sergeant Leonard Cabrera who were all forced out of the Internal Affairs Bureau, and these actions taken against them are viewed as punitive toward each of them throughout the organization due to their race/national origin.

Additionally, Captain Alvarez utilizes his authority to steer internal affairs investigations in an unfair and biased manner toward minority officers he dislikes and/or does not associate with, especially those who associate with Deputy Chief Salazar, for the malicious purpose of removing those in his way from promoting to the rank of Deputy Chief. Captain Alvarez has and will continue to abuse his authority and use favoritism as the Internal Affairs Captain to strategically place his close friends/associates ahead of minority officers. His actions have proven and shown he intends to overthrow the authority/influence of any associates of Deputy Chief Salazar to grow his authority/influence over the entire police department as a whole. Alvarez has tested for Deputy Chief and is pursuing this position to further abuse his authority in a more prominent position as second in command of the entire police department.

This serves as the crux as to why systemic racial discrimination at the Fresno Police Department has and will continue if Captain Alvarez and the entire Internal Affairs Bureau under his regime are not thoroughly investigated, specifically for cover-ups of officer misconduct for those individuals Captain Alvarez has a close relationship and/or friendship with, disproportionate discipline for minority officers in comparison to their white counterparts, and tainted/biased/unfair investigations aimed toward minority officers. For the sake of accountability and transparency, a thorough and detailed audit of actual complaints and investigations monitored by the Internal Affairs Bureau, including the IAPro BlueTeam web interface, must be completed to show any disproportionate investigations and/or any discipline imposed toward minority officers as compared to white officers. Further, the extent and time spent on said investigations against minority officers as compared to white officers must be completed. Moreover, any revisions, and/or corrections to said investigations made by Captain Alvarez and/or any objections to Captain Alvarez's decisions that were communicated by Lieutenant Viveros by email and/or in writing are needed.

## DISPARATE TREATMENT TO LIEUTENANT ISRAEL REYES AND SERGEANT LEONARD CABRERA

In addition to the experiences witnessed by Lieutenant Viveros while assigned as the Internal Affairs Commander, Lieutenant Israel Reyes and Sergeant Leonard Cabrera also experienced disparate treatment while assigned to the Internal Affairs Bureau under Captain Alvarez. Sergeant Cabrera was ultimately removed from his position and was replaced by a less experienced white officer, Josh Knapp. Lieutenant Reyes was set to replace Lieutenant Viveros but was quickly removed before he began the position and sent back to patrol working "Nights" as noted on the "Staff Movement" memorandum from Chief Balderamma. Lieutenant Jordan Beckford, who was also subject to the same internal affairs investigation as an accused along with Lieutenant Reyes, remains in her position today as the Personnel Commander directly across from the Support Division office. The Personnel Commander position consists of day shift hours, primarily 8 am until 5 pm, with a Monday through Friday work week, and weekends off. Lieutenant Reyes would have worked a similar schedule to Lieutenant Beckford had he not been punitively sent back to work as a nighttime field commander, which on occasion requires a minimum of two shifts working the hours of 6 pm until 4 am. Lieutenant Reyes was then replaced by a White Lieutenant, Sean Biggs, who today is the Internal Affairs Commander under Captain Alvarez.

Deputy Chief Mark Salazar was present for a meeting with Chief Paco Balderrama, Deputy Chief Burke Farrah, and Captain Joey Alvarez (acting Deputy Chief on behalf of Deputy Chief Phil Cooley who is out long term absence), where it was discussed to remove Lieutenant Israel Reyes from the Communications Bureau (day shift/weekends off position) and send him back to nights as a Field Commander, although he had been recently selected to be the Internal Affairs Commander. Due to an Internal Affairs investigation involving him and Lieutenant Jordan Beckford (a white female officer), Chief Balderrama decided to remove Lieutenant Reyes from his day shift position and sent him back to Nights. Deputy Salazar voiced his opinion for equal and fair treatment for Lieutenants Reyes and Beckford, specifically stating Lieutenant Beckford should be removed from her position as the Personnel Bureau Commander as well and sent to Nights. Deputy Chief Farrah and Captain Alvarez disagreed with Chief Salazar and were in favor of Lieutenant Beckford remaining in her position for "mentoring" purposes. Deputy Chief Farrah and Captain Alvarez did not argue against sending Lieutenant Reyes back to Nights.

On February 8, 2023, before her presentation at the Fresno Police Residents' Academy at Hoover High School, Sergeant Christine Leyva told me she was experiencing disparate treatment due to her race as a current Hispanic officer within the Internal Affairs Bureau under Captain Alvarez. She explained to me Lieutenant Biggs would be arriving soon at Bullard High so she would have to quickly walk away from me as she would most definitely be accused of discussing and/or sharing details of the ongoing internal affairs investigation against me.

On February 15, 2023, Lieutenant Jordan Beckford and Sergeant Marcus Gray arrived at Hoover High School to present to the Fresno Police Residents' Academy. Lieutenant Beckford never acknowledged me and did not communicate with me the entire time, although she stood a few feet away from me. CSO Dawnamrie Applegate noticed this behavior displayed toward me by Beckford.

## SEGREGATED DEPARTMENT CULTURE

The Fresno Police Department is divided into two separate groups, which has caused dissension within the agency as a whole and has led to the deterioration of a governmental institution that is demanded by the United States Constitution to represent integrity and accountability. Sadly, the breakdown of the organization due to racial strife has been detrimental to our ability to provide an effective public safety service for the community. This has naturally led to the erosion of public trust in the police department, which continues to endanger officers and the community and further divides the police and communities of color. Moreover, the rank and file constantly remain in a state of low morale as a direct result of the division of the agency's command staff. This has led to the notion of a command staff that will sabotage one another for promotion, ensuring the organization's collective demise.

For many years now, it has been widely and commonly known throughout the organization of the existence of two groups in which all officers are segregated—some by choice and some not—for acceptance. The first group is perceived as led by Deputy Chief Mark Salazar and is primarily made up of Hispanic officers or those who associate with Hispanic officers, who commonly have been referred to department-wide as the "HPOA," referring to the now defunct Hispanic Peace Officers' Association that was once under the leadership of Salazar who served as president. This organization was also referred to throughout the department, especially by white officers, as the "Mexican Mafia." Salazar also once held the position of Street Violence Bureau Commander. Many of the witnessing officers, including myself, fall under the Salazar/HPOA group due to our association with Salazar.

The second group (anti-Salazar/HPOA) is led by Captain Joey Alvarez (currently an acting deputy chief), who openly has expressed his dislike for Salazar (Captain David Ramos worked closely with Alvarez in the past and is aware). This group who associates with Alvarez is made up of primarily white officers or those who associate with white officers and/or those individuals who do not associate themselves with Salazar. Although Captain Alvarez has a Hispanic surname, it is commonly known he identifies himself as white and associates with other white officers and/or those officers who do not associate themselves with Salazar. Alvarez and his group of associates have openly undermined, demeaned, and spread rumors throughout the department against Salazar and those who associate with Salazar.

The HPOA has been characterized by Alvarez's group as an all "Brown" or "Mexican" organization made up of all Hispanic officers, which is false. In addition, the department-wide view by all officers is that unless you are "Brown" or "Mexican," you will not be selected to work under Salazar who currently oversees the Street Violence Bureau as Deputy Chief. This is also untrue. In the past, I witnessed Alvarez openly describe those who work for Salazar as "Dirty SVB guys." Officer Jose Juaregui who worked under Alvarez, was present when this occurred at the training center, and was made aware of this specific comment by me. After speaking out against Alvarez, he has openly demonstrated animus toward me each time I am in his presence. He repeatedly shakes his head, showing his disapproval toward me. Alvarez also has demonstrated this same behavior toward my son, who is also a Fresno police officer. Alvarez would shake his head and put his head down when my son was in his presence. While working under Captain Alvarez in the Southwest District as a sergeant for the Special Response Team, Captain Alvarez commented in front of my team that my son was a "Good kid and must take

after his mom." This comment was extremely offensive to me because I have never had a joking relationship with Alvarez.

Another group that has segregated itself from Salazar's cohort is the Traffic Bureau. This bureau has historically been made up of primarily White officers and is led by an all white command staff from the rank of Sergeant all the way through and up to the rank of Deputy Chief. This segregated group of Motor officers under the command of Lieutenant Anthony Dewall has created a divisive culture that thrives on rumors and gossip through group texting. These texts consist of leaked confidential information involving ongoing Internal Affairs investigations, especially those investigations involving minority officers who are not welcome/accepted into the Traffic Bureau's culture. The leaking of this confidential information was utilized by these Motor officers to create further gossip and/or ridicule toward minority officers to slander them and maliciously reduce their credibility and trustworthiness throughout the department. This culture is controlled and maintained by Lieutenant Dewall who oversees the selection of specific officers to fill any Motor vacancies. When Chief Balderrama downsized the Traffic Bureau by reducing the number of Motor officers, Lieutenant Dewall retaliated against Chief Balderrama and me to undermine our authority as Hispanic/Latino officers in command staff positions. Lieutenant Dewall made this known to me in a tirade he sent to me by email while I was assigned as a Field Commander and Public Information Officer, serving as the designee for Chief Balderrama on occasion.

## GOOD OL' BOY SYSTEM

Dyer has consistently used his influence and authority as chief and now mayor to manipulate/control the City of Fresno and its police department. Dyer's leadership style is commonly referred to as a "Good ol' boy system," meaning a culture where leaders such as Dyer use friendships and/or close connections to use their power/authority to provide favors to one another. One example of this "Good ol' boy system" occurred when Andy Hall was selected as interim chief before Dyer retired to run for mayor. In 2019, former Traffic Bureau Commander Andy Hall was selected as interim chief of the Fresno Police Department although he had not applied/tested, and/or interviewed for the position. Hall told the media he was brought into an unannounced meeting at city hall before being selected as chief and unbeknownst to Hall was asked to accept the position by then-chief Dyer, then-mayor Lee Brand, then-city manager Wilma Quan, and then-chief of staff Tim Orman. Deputy Chief Mark Salazar had tested for the Police Chief position and was one of five candidates who were described as "not up to the job" according to then-mayor Lee Brand and city manager Wilma Quan.

Another example of this "Good ol' boy system" occurred while Hall was interim chief. It was during this time, Hall promoted his very close friend Lieutenant Anthony Dewall who was far down the promotional list for Lieutenant. In 2020, Dewall told me he was only promoted to lieutenant because he was friends with Andy, referring to Hall. Hall then placed Dewall as the Traffic Bureau commander and still oversees the day-to-day operations of said bureau today, thus maintaining the toxic culture of segregation within the police department.

Hall retired in 2021 when Deputy Chief Mark Salazar was passed over yet again when Paco Balderrama from Oklahoma City Police Department was selected as the Fresno Police Department's new Police Chief. This selection came only a week after Dyer was sworn in as

mayor. Balderrama became the first Latino/Hispanic police chief in the city's history as the 22nd police chief. It became apparent Dyer's selection was yet another scheme to maintain the toxic culture within the city and its police department. Balderrama, who was an "outsider" and unfamiliar with the division/segregation at the police department, would come in unknowingly and be led/manipulated by Dyer as mayor.

Several conversations I have had with Chief Paco Balderrama since he became chief have shown me he also has been subjected to the undue pressure of Dyer's manipulation and control over the police department as mayor. On more than one occasion, Chief Balderrama has told me, "If they fire me, I'm okay with that because I was doing what was right." He went on to express to me how much "Stress" he is enduring as of late as chief. He would also tell me the reason I was under investigation was a direct result of the recent firing of the Oakland police chief.

Chief Balderrama has personally selected officers, such as myself, for certain positions and was met with retaliation by specific command staff officers, such as Deputy Chief Casto, for doing so. Sadly, Chief Balderrama is in denial of the existence of this toxic culture that permeates throughout the entire organization, creating further division/segregation of minority officers. This segregation/division of all officers within the department, especially minorities, continues and has led to extremely low department morale conditions and corruption is now afoot. Balderrama has since been made aware of this divisive culture by me several times. This has and will inevitably endanger the officers and the residents of Fresno if not overseen by the federal government. The city of Fresno's government, including the police department, is in dire need of changes to leadership and/or practices to ensure the constitutional rights of each officer/employee.

## FRESNO POLICE OFFICERS ASSOCIATION

For more than 40 years, the Fresno Police Officers Association (FPOA) has had all white presidents. Currently, the FPOA's president and vice president are both white--Brandon Wiemiller (president) and Jeff Lablue (Vice President). Joey Alvarez is also currently one of the FPOA's board of directors. Wiemiller, Lablue, and Alvarez share a close friendship, which compromises the integrity of any internal affairs investigation Alvarez oversees, especially the current internal affairs investigation where he is listed as an "Accused." Although Alvarez is an "Accused" for an ongoing internal affairs investigation, he remains as the Internal Affairs Captain/Acting Deputy Chief. Chief Balderrama continues to fail to hold Alvarez accountable for his actions and yet again has failed to remove Alvarez from said position, compromising the department's ability and effectiveness to maintain the integrity of any pending internal affairs investigations. The FPOA has also refused to provide me with legal representation, although the complaint is directly related to the open/pending internal affairs investigation on me, regarding the hostile work environment complaint I made against the city, specifically naming Alvarez. It's evident the FPOA is covering up for Alvarez and protecting him against any further investigation. I specifically mentioned to FPOA Legal Defense Chair and 2nd Vice President Scott Shepard of my concerns as to why Alvarez was not under investigation for downplaying and covering up the serious misconduct involving Officer Jason Serrano's arrest for assault and battery for which Serrano is currently facing pending charges in the Santa Cruz Superior Court.

## RACIAL PROFILING

The systemic racial discrimination culture that is condoned by the City of Fresno has affected the police department's ability to effectively provide public safety to all residents of Fresno without fear of racial profiling. Consequently, the Fresno Police Department has failed to collect, record, and report mandated demographic data to the Attorney General's Office and is incapable of policing itself and effectively holding officers accountable. California Assembly Bill 953 mandates for the Fresno Police Department to collect and report demographic data for all vehicle and pedestrian stops and citizen complaints alleging racial and identity profiling. The web-based demographic data collection system, known as the Stop Data Collection System (SDCS), is administered by the State of California and requires the Fresno Police Department to collect, record, and report such data. It is commonly known throughout the department this data is consistently underreported and inaccurate. An audit of this data collected and reported by the Fresno Police Department to the Attorney General's Office in comparison to actual recorded classification event codes, clearance codes, and/or the physical electronic citation devices issued to individual Motor Officers by the Fresno Police Department will show disproportionate stops of minorities, specifically Hispanics and African-Americans, and inaccurate reporting of any such stops/detentions.

The Traffic Bureau, which has an all white command staff, also targets minorities through "special operations" funded by the State of California's Office of Traffic Safety, such as "Search and Find" and "DUI Checkpoints" for the purpose of a substantial amount of self-serving overtime for its officers. An audit of impound fees for the past 10-15 years will disproportionately represent Hispanic and African-American over the white community in Fresno.

These disproportionate stops/detentions as a direct result of racial profiling have led to an unequal and substantial amount of officer-involved shootings involving minorities as compared to the white community. A 2017 report, Reducing Officer-Involved Shootings in Fresno, California, prepared by the American Civil Liberties Union of California (ACLU), listed one of their many key findings that between 2011 and 2016, black and Hispanic residents accounted for 80% of officer-involved shootings. They further reported between 2008 and 2016, 19 lawsuits were filed against the city related to officer-involved shootings that ultimately resulted in 8 closed cases, costing the city more than $5.3 million. In 2021, the city of Fresno settled two federal civil rights lawsuits related to fatal police shootings, resulting in nearly $10 million paid to the families of Isiah Murietta-Golding and Casimero Casillas. In 2023, two of the three police shootings involved Hispanic males--Robert Corchado and Richard Castrillo--who were shot at the hands of white officers. Corchado was fatally shot while unarmed.

## TAINTED INTERNAL AFFAIRS INVESTIGATION AGAINST ME

I continue to be targeted today as the subject of an unfair, grossly biased, and extremely tainted investigation by the Fresno Police Department's Traffic and Internal Affairs Bureaus since December 2022 regarding minor damage (dent) to my assigned work vehicle. This tainted investigation led to a multitude of false accusations/allegations toward me as well as crude rumors, adversely affecting my son (Officer Ignacio Ruiz III) and my brother (Sergeant Ramon Ruiz). The Support Division under the direction of Deputy Chief Casto and investigated by Traffic Bureau Commander Anthony Dewall led to an extremely costly and rigorous investigation, where internal and external "experts" were hired, an event data recorder was used,

the infotainment system was removed from the vehicle, and my department cellphone was taken from me. This type of investigative action has not taken place against any officer(s), especially a staff officer, ever in the history of the police department.

Although I was initially cleared of any wrongdoing by the Internal Affairs Bureau, I became targeted and the subject of an egregiously tainted, unfair, and biased internal affairs investigation conducted by the Fresno Police Department's Traffic and Internal Affairs Bureaus, specifically by Lieutenant Anthony Dewall, Captain Tom Rowe, Captain Joey Alvarez, and Deputy Chief Mindy Casto who manipulated Chief Paco Balderrama throughout the entirety of the investigation to retaliate against Chief Balderrama for selecting me rather than Lieutenant Biggs for the Police Community Relations Section within the Support Division.

Upon learning of the second memorandum indicating further review, I phoned Chief Balderrama who told me "It was no big deal and would most likely be Unfounded." He also told me Deputy Chief Casto recommended NOT to inform me of the ongoing investigation on me." Chief Balderrama told me to call Deputy Chief Casto with any concerns I had regarding the investigation. When I phoned Casto and asked her why she and Dewall were "Railroading me," she immediately interrupted me and said, "I wanted to tell you but the Chief said not to." Chief Balderrama would later tell me Casto apologized to him for not telling me about the investigation. Chief Balderrama also told me Casto had flat out lied to me about him not wanting to tell me about the investigation on me. Chief Balderrama said it was Casto's idea to not tell me. Casto also directed me to Captain Alvarez if I had any concerns regarding the investigation.

On several occasions during this investigation against me, I phoned Chief Balderrama and voiced my concerns about this biased investigation involving Deputy Chief Casto, Lieutenant Dewall, and Captain Alvarez, who based on my sources were leaking confidential information, creating rumors, and specifically, Captain Alvarez was withholding and covering up pertinent information regarding internal affairs investigations but Chief Balderrama ignored me and denied the allegations. An investigation was never completed by Chief Balderrama regarding the concerns I had voiced to him.

Since then, Motor Officer Dominic Morini came forward by informing my brother, Sergeant Ramon Ruiz, of the personal vendetta against me by Traffic Bureau Commander Lieutenant Anthony Dewall, who openly shared with Sergeant Brian Chadwick how he dislikes me over an incident that previously occurred at the Big Fresno Fair. I recalled the incident Dewall was referring to that occurred in October 2021, where Dewall accused me and my team of officers of "double dipping" while working at the Big Fresno Fair, which was a completely false allegation made by Dewall. I phoned my superior at the time, Lieutenant Andre Benson, and made him aware of the accusation. Lieutenant Benson was extremely displeased with Dewall's allegation toward me and my team and phoned Dewall to clear up the issue. Lieutenant Benson would have further details as to the extent of their conversation.

Dewall also spread rumors and false theories of me having an affair that involved a domestic violence incident that led to damage to my work vehicle throughout the Traffic Bureau during his investigation of me. Motor Officers would continue to spread this gossip and rumors through a group text for the sole purpose of vilifying me as a liar and a cheater. Ultimately, this led to the internal affairs investigation on me and eventually forced me out of my dream job as the Police

Community Relations Commander, which was the mission of the Traffic Bureau's/Support Division's all white command staff as follows:

- Deputy Chief Mindy Casto

- Captain Tom Rowe

- Captain Don Gross

- Lieutenant Timothy Tietjen

- Lieutenant Anthony Dewall

- Sergeant Mark Van Wyhe

- Sergeant Brian Chadwick

- Sergeant Micheal Stanford

- Sergeant Michael McCray

- Sergeant Todd Turney

This investigation of me has affected my brother, Sergeant Ramon Ruiz, as well. In March 2023, my brother, Ramon Ruiz, made a complaint against Lieutenant Robert Dewey, who is a white officer, and Sergeant Roland Rendon, regarding policy violations on a particular call for service (Ramon can provide the details). After making the said complaint, Ramon was made aware by Lieutenant Israel Reyes and Captain Michael Landon of an accusation toward him that the purpose of his complaint was to retaliate against Rendon because of the pending internal affairs investigation against me.

This completely tainted, unfair, and biased internal affairs investigation was launched against me as the result of collusion between Lieutenant Dewall, Captain Alvarez, Captain Tom Rowe, and Deputy Chief Mindy Casto to also retaliate against Chief Balderrama for personally selecting me as the Commander for the newly created Police Community Relations Section. Their motive was to remove me from this position so they could select one of their own and to demote and/or terminate me as a Police Lieutenant to continue the underrepresented minority officers in command staff positions.

Chief Balderrama, who is also Latino, was manipulated by said individuals under the guise that this tainted, biased, and unfair investigation would be used to "Exonerate" me. Conversely, their investigation exceeded great lengths to create false accusations against me to reduce my credibility. Further, my direct superiors, Captain Rowe and Deputy Chief Casto, ostracized me and treated me unfairly and with hostility, further creating an illusion of wrongdoing by me within the Support Division office and throughout the department. I also fear retaliation by Lieutenant Dewall, Captain Alvarez, Captain Rowe, and Deputy Chief Casto, by now having reported this corruption and acts of racial discrimination to the City of Fresno's Personnel Services Department.

I am also requesting any and all emails, department-issued cellphone texts, and/or written correspondence related to the internal affairs investigation on me between Chief Balderrama, Deputy Chief Casto, Captain Alvarez, Captain Rowe, and Lieutenant Dewall.

## PERSONAL EXPERIENCE OF DISPARATE TREATMENT

- DC Burke Farrah would refer to me in front of other command staff officers including Chief Dyer and Chief Balderrama in Spanish as "La Voz," translating to "the voice" in English. This consistently occurred from 2017 through 2022 while I was the Fresno Police Department's announcer for any formal swearing-in and/or award ceremonies. I have never had a joking relationship with Farrah and took the comment as offensive as it relates to my national origin, although the announcements I made were in English.

- January 2022, I was promoted to Lieutenant. Chief Balderrama told me of "Grumblings" by executive staff officers for him skipping Robert Dewey, Michael Gebhart, and Leslie Williams who are all white officers, and DC Salazar advised me he was the only one who advocated for me to be promoted while DC Burke Farrah and DC Michael Reid who were present remained silent and did not advocate for me.

- November 28, 2022 - Chief selected/notified me of my Police Community Relations assignment. Chief Balderrama skipped Sean Biggs, which caused further grumblings with executive staff, mainly Deputy Chief Casto, who wanted Biggs and not me for the position.

- Deputy Chief Salazar and Chief Balderrama made me aware I was not chosen by Deputy Chief Casto rather she requested for Lieutenant Sean Biggs to oversee the Police Community Relations Section before a phone call to me from Chief Balderrama selecting me for the position

- December 6, 2022 email sent to all personnel regarding Staff Movements, indicating Lieutenant Reyes would be assigned to Internal Affairs and I would be assigned to Police Community Relations.

- December 7, 2022 - Staff Movement email rescinded by Chief Balderrama. A follow-up email was sent on the same date indicating Lieutenant Reyes would not be assigned to Internal Affairs but to "Nights" instead. Lieutenant Biggs was noted to be assigned to Internal Affairs.

- December 7, 2022 - Email received from Rowe to discuss my new position. I responded to meet but never received a response from him.

- December 21, 2022 - Email received from Sergeant Antonio Route confirming my work cell phone/number.

- December 28, 2023 Email received from Deputy Chief Casto that was sent directly to Community Service Officer (CSO) Josanna Ramer regarding an opening in the Support Division. Ramer was favored by Casto but a panel that included Officers Jacky Parks, Lindsay Dozier, and myself selected CSO Dawnmarie Applegate as the number one candidate for the position. Ramer was not one of our "Top 3" selections. Told Rowe of our

decision and he made me aware Casto would not be happy. As a result, Rowe told me had placed Ramer within the "Top 3" to appease Casto. This was unsettling to me.

- January 2, 2023, was my first day assigned to the Support Division. I was placed in the smallest office within the entire office and positioned between Captain Rowe and DC Casto. Constantly ridiculed and laughed at by DC Casto in front of Rowe and Steve Casto because of the small office I was placed in by DC Casto. Captain Alvarez and Lieutenant Dewall were also present during these comments and laughed at my expense.

- From January 2, 2023, until March 15, 2023, Captain Tom Rowe subjected me to rude and demeaning remarks/comments disguised as jokes. The first week of January 2023, Rowe told me not to advise him of my daily schedule because if he didn't "trust" me he would just "Send me back to Nights." On February 10, 2023, texted Captain Rowe regarding active shooter training inquired by Sergeant Ia. Rowe ignored my text for several hours. I had to return to the office and speak to him in person as to why he had not responded. Rowe looked at me with disgust and asked, "What is it?" He then picked up his phone and told me, "You're an adult man. Figure it out." Immediately I was embarrassed and offended so I asked him to repeat what he said and he did with a smirk on his face. On the same date, Rowe told me twice "He didn't like me." Once was in the office and the other time occurred in the presence of Sergeant Erik Ia at a Fresno Police Explorers meeting at the Northeast District station. Rowe daily would ask me "Did you break it yet?" Rowe would also tell me to "Go away" anytime I went to his office. At no time did he ever initiate a conversation with me. Our conversations mostly consisted of a one-way conversation where I informed him of any updates from my section out of fear Rowe would send me back to "Nights" as he had previously threatened.

- From January 2, 2023, through my last day at the Support Division office on March 20, 2023, repeated closed-door huddling sessions in DC Mindy Casto's office with Captain Tom Rowe, Captain Don Gross, Captain Joey Alvarez, and Lieutenant Tim Tietjen. Sessions were at least an hour each and consisted of cursing and laughter. This would cause me severe mental suffering to get out of bed each day, put on a smile, and try to fit in at work. I dreaded any occasion I had to sit in the Support Division office. It would make me sick to my stomach. Each day though, I would maintain a professional and respectful attitude toward everyone in the office. I also maintained a strong work ethic.

- January 10, 2023, DC Casto recommended for me to attend SB 2 training at city hall. While there I was ignored by Captain Alvarez and Lieutenant Beckford who sat together.

- From January 13, 2023, through February 24, 2023, Deputy Chief Casto inquired about my work phone several times and recommended for me to turn it into Captain Alvarez for a new one.

- January 19, 2023 webinar training for SROs. Deputy Chief Casto had me complete a single Training Request Form for multiple officers to pay one fee of $75 rather than for each student. This was unethical behavior displayed by DC Casto.

- January 29, 2023, invited by Captain Gross to Fresno Force Hockey. Began my research into the program and found photographs of Deputy Chief Burke Farrah and Captain Don Gross with former officer Rick Fitzgerald on the program's Facebook profile page. Fitzgerald was terminated by Chief Balderrama after learning of his membership with the "Proud Boys" extremist group in 2021.

- February 8, 2023, told Sergeant Steve Casto, Mindy's husband, of the daily department emails I received regarding the "Learned dashboard" at 5 am. Casto said they were automatically sent. DC Casto was present during this conversation and closed the door behind her and Steve immediately. February 8, 2023, was the last email I received from Steve Casto. These emails pertain to Vigilant, which is a license plate reader software.

- February 13, 2023 email from Lieutenant William Dooley re: Training in Atlanta. Casto said, "Well I guess if the Chief says you're going then you're going. We'll have to find the money somewhere."

- Erik Ia requested an office and a computer from Rowe before I began PCR. I requested again from Rowe but my request was ignored by Rowe, Casto, and Gross. Erik Ia is also an associate of DC Salazar.

- February 27, 2023, met with Monica Diaz, who is the CEO of Diaz Financial Services & LULU Foundation Founder, who served as Jerry Dyer's campaign manager for mayor in 2020. We discussed my idea for a Fresno Police mariachi band. During our lengthy conversation, she provided and indicated she had more information as to why Salazar was not the Chief because he was perceived as favoring Mexicans, so she did not want me to follow in the same footsteps which would hurt my chances of further promotion within the police department.

- February 27, 2023, DC Casto began weekly Monday morning meetings. Those meetings were attended by Captain Tom Rowe, Lieutenant Anthony Dewall, IT Manager Brandon Yost, Captain Don Gross, Records Supervisor Kelly Keifer, Lieutenant Larry Bowlan, CSIB Supervisor Scott West, Lieutenant Tim Tietjen, and DC Casto (an all white command staff/group of supervisors). I intentionally did not attend 3 of the 4 meetings during my time in PCR out of the feeling of extreme intimidation and perceptions of guilt they all cast on me by staring and keeping quiet when I was present in the support division office. CSO Dawnmarie Applegate was made aware of my uncomfortable feelings for which I told her to schedule our appointments to get out of my attending those meetings. March 15, 2023, Captain Rowe reprimanded me again for not attending those meetings and ordered me to attend on March 20, 2023.

- March 3, 2023, pitched mascot and community engagement vehicle to Captain Rowe. He was annoyed when I asked to meet with him and DC Casto together to share my ideas. Casto looked away from me and instead stared at Rowe as I spoke. Rowe rolled his eyes after I finished talking.

- March 8, 2023, advised DC Casto of Easter Baker sale for PCR Fundraiser

- March 9, 2023, IA Interview with Knapp/Bell

- March 9, 2023 Meeting with Chief Balderrama re: mascot and community engagement vehicle. CSO Applegate noticed an awkward feeling in the room and Captain Rowe making faces as I made my pitch.

- On March 10, 2023, Captain Rowe reprimanded me for not advising him of the Easter bake sale belittling me further and undermining my management position.

- March 13, 2023, Lieutenant Jordan Beckford's animus treatment toward me was witnessed by Officer Lindsay Dozier and CSO Dawnmarie Applegate. Beckford held the door open as we walked through and she ignored me while making a disgusted/annoyed face at my presence.

- March 17, 2023, Captain Alvarez and Lieutenant Biggs came to my office, closed the door, and Alvarez told me, "Look, a lot of people care about you. We believe you but we need your work phone so we can exonerate you. I then walked them to my work car in the parking lot and provided them with my work phone. Alvarez then told me, "I know this fucking sucks, but sometimes we are forced to investigate certain matters." As he walked away, he told me "I'm sorry."

- March 21, 2023, at 9 am I met with HR Director Jennifer Misner and filed a hostile work environment complaint. Did not hear back from Misner until 33 hours later, on March 22, 2023, @ 6:30 pm. I sent several emails to her during that time asking for an update. She said she had consulted with City Attorney Tina Griffin and was waiting for further direction.

- March 23, 2023, Mindy Casto called a meeting and in an open forum asked if anyone spoke to me, where Sergeant Erik Ia volunteered he had and was told by Casto to send an email to City Attorney Tina Griffin, further ostracizing me from my peers although I am on paid administrative leave that is not punitive.

- March 24, 2023, Lieutenant Israel Reyes informed me of a conversation with Lieutenant Robert Dewey, who told Reyes of a conversation he had with Captain Horsford regarding a "meeting" over Sgt Gray filling my spot in PCR and how I filed a hostile work environment claim in which Lieutenant Reyes was now a part of.

- BlueTeam web interface comments and/or entries made by officers are not retained by the department regarding Internal Affairs complaints. This is a lack of transparency.

## MY QUALIFICATIONS

- Sworn Fresno police officer for 24 years and 6 months

- Currently hold the rank of Police Lieutenant

- Bachelor's and a Master's degrees in Criminal Justice Administration

- P.O.S.T. Sherman Block Supervisory Leadership Institute graduate

- 2014 Top Cop Award
- Consistently rated in the "Outstanding" overall category for annual performance evaluations by my prior supervisors
- Southwest District Crime Suppression Team
- Bulldog Tactical Team
- Night Detective Unit
- Felony Assault / Robbery Unit
- Homicide
- Southwest District Special Response Team (SRT) Supervisor
- MAGEC Metropolitan Tactical Team Supervisor
- Southwest District Field Commander
- Police Community Relations Commander

## PRIOR RACIAL DISCRIMINATION LAWSUITS AGAINST THE CITY OF FRESNO

In 2006, Yolanda Moralez filed a lawsuit against Dyer and the City of Fresno, alleging Dyer was responsible for the death of Lieutenant Jose Moralez. The lawsuit filed by Yolanda by attorney Kevin Little was suspiciously dismissed only three months later. In 2007, now retired Captain Al Maroney, who is African American, filed a discrimination complaint with the federal Equity Employment Opportunity Commission, resulting in department-wide sensitivity training. Maroney would later cite the fact former Deputy Chief Keith Foster, who was convicted in 2016 for conspiracy to traffic heroin and marijuana and sentenced to federal prison for four years, defended Dyer as his best friend. Discrimination lawsuits by retired Sergeant James Lewis and former police cadet Jonathan Pierro followed but were successfully defeated by Dyer. In 2008, former Officer Gerald Miller who is African American sued the Fresno Police Department for discrimination and claimed he was retaliated against by Dyer and was ultimately terminated. Miller also alleged he was targeted by then-Lieutenant Joey Alvarez. In 2011, then-Officer Ron Manning, who is now a Sergeant, reached a confidential settlement regarding a discrimination lawsuit against Dyer.

Also in 2011, Deputy Chiefs Robert Nevarez and Sharon Shaffer filed a lawsuit against Dyer for creating a hostile work environment toward them by subjecting them to harassment, retaliation, and discrimination. The lawsuit alleged Dyer had used offensive terms about women, African-Americans, and Asian Americans. Both sides agreed to settle, costing the city of Fresno $300,000. Excerpts from the lawsuit are listed below.

- "When referring to African American individuals, including employees, Dyer sings the antebellum slave song 'Mammy's little baby loves short'nin bread.'"

- "During a meeting discussing fist strikes to the face, Dyer commented that fist strikes to the face should never occur, unless it is a brother, because brothers don't have bones in their noses."

- "Dyer has repeatedly made derogatory and racial comments and/or actions relating to different races, including, but not limited to African Americans and Japanese, which include: 'You know brothers can't resist watermelons.'"

- "Dyer's cellular phone ringtone for Blong Jong, a Southeast Asian council member, is an Oriental-sounding ringtone. Dyer has also stated that his ringtone for Cynthia Sterling, an African American former council member, is the song 'Mammy's little baby loves short'nin bread.'"

- "Dyer refers to a female Japanese Police Department employee as his little Geisha Girl."

- "Dyer has made offensive remark relating to charging the County of Fresno an administrative fee for administering a grant, stating 'Good, rape them (laughing), and make them feel like they liked it.'"

In 2020, Sergeant Temujin Bustos filed a lawsuit against Dyer and Hall for racial discrimination and alleges Hall called Bustos a "Zika baby. Bustos was also passed over for promotion several times and stated that lower-scoring White officers were promoted over Hispanic officers.

## 2015 DEPARTMENT SURVEY REPORT

In 2015, Dyer authorized an anonymous survey unbeknownst to the Mayor and City Manager, which was conducted by the Josephson Institute of Ethics and produced a lengthy report. Data from the report was leaked to the Fresno Bee, resulting in the release of the report in its entirety in 2016. Then-police auditor Rick Rasmussen described the report as "disturbing." A single portion of this report can be referenced below.

SECTION II: ORGANIZATIONAL EXCELLENCE CULTURE

FINDING 2. Organizational Culture. The current culture of the FPD is dominated by deep and widespread discontent, distrust, disconnection and that high standards of accountability and integrity are not consistently adhered to. This negative culture is hampering FPD's ability to meet all its mission goals, is a major factor impeding FPD's efforts to attract and retain a sufficient number of qualified sworn and civilian employees, and makes the department vulnerable to costly and discrediting conduct.

FINDING 2A. Morale. Low morale pervades the entire culture of FPD but is particularly intense in patrol division and civilian units. Two-thirds of sworn officers (68%) and more than half of civilian employees (52%) believe the morale problem presents a serious or severe threat to the ability of the FPD to perform its mission. Of that group More than one-third (37% of sworn

officers and 16% of civilian employees) believe that low morale is a "severe problem presenting an imminent and major threat to performance or damage to the agency".

FINDING 2B. Cynicism and Distrust. The FPD culture is permeated with widespread cynicism and distrust. A substantial proportion of both sworn and unsworn employees expressed the belief that nothing good would come from this effort or their willingness to complete the survey. Comments revealed a common conviction that the leaders of FPD already know all they need to know but are unwilling to make the changes necessary to restore trust and morale.

SUPPLEMENT TO COMPLAINT SUBMITTED BY LT. IGNACIO RUIZ

*Email Submitted on April 24, 2023:*

*Mr. Dale, good evening.  My client and I look forward to meeting with you.  I have a trial scheduled early next month that I am busy preparing for but which I anticipate will settle. If I am correct, I will have much more flexibility in the near future than I do currently.  Can we wait until late next week to schedule an appointment, when I will have a more predictable schedule?*

*I also wanted to advise you that it has come to my attention that Sgt. Bustos and Off. Chris Cooper have been telling officers and staff at the Fresno Police Department -- including openly in a patrol briefing -- that my client is "not going to survive" his pending investigation.  These officers have also been spreading false rumors that my client was romantically involved with a married woman from Clovis, and that her husband had a confrontation with Lt. Ruiz that resulted in the patrol vehicle damage that is the basis of a pending investigation.  There is another component to this false rumor, the suggestion that the woman's husband contacted Clovis PD and identified Lt. Ruiz.  It is even more dismaying that the sources of the above misinformation are a supervisor (Sgt. Bustos) and an FPOA Legal Defense Trustee (Off. Cooper).*

*These sorts of rumors and comments only reinforce my client's belief that he is being treated unfairly, is the subject of retaliation, and that an independent investigation should be done regarding both his complaint and any allegations of misconduct still pending against him.  My client is intent on presenting his allegations to a neutral investigating body if he becomes convinced they will not be addressed in good faith within the department.*

*I am copying Chief Assistant City Attorney Ms. Griffin and the FPOA on this communication as well.*

Date of Occurrence:

On or about the week of April 10 or 17, 2023

Location:

Central District Station, Day Shift Patrol Briefing

Knowledgeable Witnesses:

Officers Jordan Wamhoff, Brian Twedt, Stephanie Pope, Brian Booth, Patrick Feller, Caroline Ponce, and Jake Dellone; Corporals Samuel Sanders and Meng Xiong

*Email Submitted on May 2, 2023:*

*Dear Mr. Dale and Ms. Griffin:*

*I am once again writing to bring to your attention the ongoing misconduct and inappropriate behavior of Sergeant Steven Jaquez and Officer Caitlin Miller of the Fresno Police Department, regarding my client, Lieutenant Ignacio Ruiz.*

*It has come to my attention that Sergeant Jaquez and Officer Miller have been circulating false and inaccurate information regarding my client's pending personnel issues amongst their fellow officers. This behavior is unacceptable and is a clear violation of departmental policy. Furthermore, this is not the first instance of such misbehavior, as other members of the Department have previously made similar false claims that my client was going to be fired.  Indeed, there are reports from persons with firsthand knowledge that the dissemination of misinformation regarding my client is occurring Department-wide.*

*It is highly disconcerting that an officer who has a pending serious complaint about discrimination, retaliation and favoritism within the Department, which impacts not only personnel issues but how it serves its community, is being mistreated in this manner.*

*As you are aware, my client has built an excellent reputation over his 25 years of service in the department. It is unacceptable that he is being subjected to such misconduct and retaliation from his colleagues. These wrongful and inaccurate disclosures are not only harmful to my client's reputation, but they also negatively impact the department's overall functioning and create a toxic and hostile work environment.*

*I am urging you to take immediate action and investigate this matter thoroughly. This behavior should not be tolerated, and appropriate corrective action should be taken to ensure that it does not happen again in the future.*

*Thank you for your attention to this matter.*

Date of Occurrence:

April 26, 2023

Location:

During a Street Racing Training Course Held at the CHP Office on Orange and North Avenues

Knowledgeable Witnesses:

Officers Omar Khan, Corey Evans, Steve Rocha, Nathan Cruz, Domenek Mendez, Damian Hererra, Jose DeLeon, and Alex Navarro